[Cite as *Dalton v. Ohio Dept. Rehab. & Corr.*, 2014-Ohio-2658.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Robert Dalton,          :

         Plaintiff-Appellant,      :

v.                         :          No. 13AP-827
                                            (Ct. of Cl. No. 2012-01457)

Ohio Department of Rehabilitation and    :
Correction,

                                           (REGULAR CALENDAR)

                             :

         Defendant-Appellee.      :

                             :

D E C I S I O N

Rendered on June 19, 2014

*Daniel H. Klos,* for appellant.

*Michael DeWine,* Attorney General, and *Eric A. Walker,* for appellee.

APPEAL from the Court of Claims of Ohio

CONNOR, J.

{¶ 1} Plaintiff-appellant, Robert Dalton, appeals from a judgment from the Court of Claims of Ohio, granting the Civ.R. 56 motion for summary judgment filed by defendant-appellee, Ohio Department of Rehabilitation and Correction ("ODRC"). Because (1) Dalton failed to establish a prima facie case of perceived disability discrimination, (2) ODRC complied with Ohio Adm.Code 123:1-30-03 when it sent Dalton to an independent medical examination ("IME"), and (3) Dalton failed to establish genuine issues of material fact regarding his claims for invasion of privacy, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2}   Dalton filed a complaint against ODRC on January 27, 2012. The complaint alleged that ODRC discriminated against Dalton on the basis of a perceived mental impairment by sending Dalton to an IME, and that ODRC invaded Dalton's privacy by requiring him to undergo the IME and by distributing the results of the IME.

{¶ 3}   The events giving rise to the complaint occurred shortly after Dalton was reinstated to his job as a Psychology Assistant 2 with ODRC in January 2010. Dalton initially began working for ODRC as a Psychology Assistant 2 at the Mansfield Correctional Institution in 2005. In 2006, Dalton transferred to the Corrections Reception Center ("CRC") because it was "closer" to his home, "and safer." (Dalton Depo., 27.) As an ODRC employee, Dalton was also a member of the Service Employees International Union 1199 ("SEIU/1199"). In 2008, Dalton became a union delegate, and was "responsible for representing the membership file and grievances, unfair labor practices, disseminating information, that kind of stuff." (Dalton Depo., 34.)

{¶ 4}   In spring 2009, ODRC fired Dalton for misusing the state's email system, engaging in political activity while on the job, and intimidating a witness. Dalton grieved his termination, pursuant to the collective bargaining agreement in place between SEIU/1199 and ODRC. The grievance proceeded to arbitration, and the arbitrator found that Dalton did not misuse the state's email system or engage in political activity while on the job, but that he did intimidate a witness. The arbitrator reinstated Dalton with back pay, less a five-day suspension, and Dalton returned to CRC on January 28, 2010. Dalton completed the necessary requirements and received his psychologist's license in November 2009.

{¶ 5}   Dr. Robert C. Hammond, the chief of the Bureau of Mental Health at ODRC, called Dalton sometime after Dalton returned to work in January 2010 and said, "it's time to figure out how we're going to place you into a psychologist position." (Hammond Depo., 26.) Dr. Hammond noted that he had contacted the state Board of Psychology and confirmed that, "when somebody is a psych assistant and they become a psychologist, that they can no longer be on somebody else's license. At that time, they become an independent professional." (Hammond Depo., 26.) Accordingly, as Dalton

had obtained his psychologist's license, Dalton could not continue working under another psychologist's license as a Psychology Assistant 2.

{¶ 6} Dr. Hammond explained that, when he began to discuss moving Dalton into a psychologist position, Dalton told Dr. Hammond that he did not want to talk, as there were "people who listen in on [his] conversations." (Hammond Depo., 26.) Dalton told Dr. Hammond he would call him "after work * * * on a secure line." (Hammond Depo., 26-27.) Dalton called Dr. Hammond later that evening, and told Dr. Hammond he was concerned that if he moved to a psychologist position, it "would give central office and the warden more ability to do damage to his career, so-to-speak; that they could go after his license." (Hammond Depo., 27.) Dalton believed that if he "remained in a psych assistant position, that * * * in some way he felt more protective in that role." (Hammond Depo., 27.) Dr. Hammond also went into Dalton's office to ask him how things were going. In that face-to-face interaction, Dalton told Dr. Hammond that he was concerned "that they're going to come after me" and worried about "what they're going to do with my family." (Hammond Depo., 78.)

{¶ 7} On March 1, 2010, Dalton sent an email to Hugh Quill, the director of the Department of Administrative Services, requesting "some emergency assistance in getting out of work on administrative leave because of an investigation." (Dalton Depo., State's exhibit D.) Dalton reported in the email that an investigative interview conducted by ODRC during Dalton's first termination "was creatively edited and manipulated to frame me." (Dalton Depo., State's exhibit D.) Dalton further reported that someone had hacked into his personal email account and sent an email containing "a policy violating porn link" from his personal account to his work account, and noted his belief that it was "an ODRC employee that hacked into my email account." (Dalton Depo., State's exhibit D.) Dalton also told Quill that ODRC "purposely delayed giving [him] a 'man down' alarm for a full month" after Dalton returned to work, and noted that "[a]ll employees have an alarm issued and inmates know who doesn't have one." (Dalton Depo., State's exhibit D). The final two paragraphs of the email stated as follows:

> My wife and I are concerned that the next attempt they take
> to get me, they won't miss. We are both worried about drugs
> being placed in my office or some other set up. My
> supervisor tells me, my fears are justified. My work

> conditions have deteriorated horribly to my detriment. I have contacted the State's EAP for assistance.
>
> I cannot go through the ODRC assistance for remedy given the level of Mr. Croft in the organization and the sensitive nature of the investigation. Can you direct me how I can get out on Admin leave pending completion of the investigation? If you need documentation, I can provide whatever you need to substantiate my concerns. I am worried about what is next.

(Dalton Depo., State's exhibit D.)

{¶ 8} Dr. Hammond obtained the Quill email and, based on Dalton's statements in the email and Dalton's statements to Dr. Hammond during their interactions, Dr. Hammond decided to request an IME in order "to clarify is, you know, is there a problem that's going to keep this individual from being able to work." (Hammond Depo., 39.) Dr. Hammond noted that the Quill email raised a "red flag," as it was a "deviation from the typical procedures that an employee would follow if they had some kind of concern," and because in the email it appeared that Dalton was alleging that "the institution [was] purposely trying to do something harmful to him." (Hammond Depo., 25, 32.) Dr. Hammond explained that, based on the "level of distress" represented in the email, his concern was "do we have a distressed employee" and "worst case scenario is do we have an employee here who has some type of personality disorder that could have an impact" on their job. (Hammond Depo., 40.) Dr. Hammond "hope[d] that the evaluation [would] show that [Dalton was] doing perfectly fine," but felt that he "was under obligation to at least look at this and say, you know, let's check these things out." (Hammond Depo., 73.) Dr. Hammond noted that when he has an employee exhibiting "erratic behavior that could affect patient care, then" Dr. Hammond wanted "verification that they're okay." (Hammond Depo., 74.)

{¶ 9} On March 18, 2010, Dr. Hammond sent a letter to Ginny Lamneck, the warden of CRC, requesting that Dalton be ordered to undergo a psychological/psychiatric IME. In the letter, Dr. Hammond recommended that Dalton undergo a "[p]ersonality assessment to include MMPI-2 [the Minnesota Multiphasic Personality Inventory 2 test] and MCMI [the Million Clinical Multiaxial Inventory test]."

(Dalton Depo., State's exhibit I.) The goal of the assessment was "to answer whether or not there is a dysfunctional behavioral profile that [would] impede[] [Dalton's] work in a correctional setting." (Dalton Depo., State's exhibit I.) Dr. Hammond noted in the request that it was "essential to know if [Dalton's] current reactiveness is within the normal limits of having been a part of a recent investigation, or if it is suggestive of either an Axis I related paranoia or Axis 2 condition." (Dalton Depo., State's exhibit I.) Dr. Hammond explained that there was an "alleged recurring theme in [Dalton's] interactions with both institutional staff and Central Office Staff where Mr. Dalton offensively makes accusations toward staff on a variety of complaints," and is "then quick to suggest that there is retaliation for his actions by staff across many of these settings." (Dalton Depo., State's exhibit I.) Dr. Hammond noted the following "6 examples are indicative of the tone of paranoia that permeates many of his descriptions of events":

> 1) The institution is denying him use of a "man down" alarm so that he can be assaulted.
>
> 2) He accused the Office of the Inspector of tampering with his interview tapes to frame him. This was quoted in an email addressed to the Director of DAS (Full quotation from email, *"As it turned out, my investigative interview done by the Deputy Chief Inspector Linda Coval of ODRC and overseen by the Chief Inspector, Gary Croft, was creatively edited and manipulated to frame me. I had a Forensic Audio Engineer conduct an analysis and indeed, my interview was edited and cut."*)
>
> 3) He refuses to take on a psychology position after becoming licensed in Ohio as a psychologist because it will "make him a target" and they (Central Office) will "come after me."
>
> 4) He requested that the Department of Administrative Services place him on emergency Admin Leave, because he was concerned about having it done through ODRC.
>
> 5) He states that he is having his email "hacked" into by someone at ODRC. *("I recently had my personal email account hacked into about 10 days ago, and had an email set from my this account to my work email at ODRC. This*

> *personal email account had the same password as my ODRC account. The email was a policy violating porn link that got sent to my work, even though we only have access to the intranet, not internet. I immediately wrote an incident report and reported it to my supervisor.")*

> **6) Since his return to work, he has publicly stated that he should move to a different institution because the Warden is "out to get him". When he has contacted this writer, he often states that he has to call later after working hours, because the line is not secure.**

(Sic. passim.)(Dalton Depo., State's exhibit I.)

Based on Dr. Hammond's request, ODRC authorized Warden Lamneck to obtain a professional evaluation of Dalton, pursuant to Ohio Adm.Code 123:1-30-01 and 123:1-30-03.

{¶ 10} On March 31, 2010, ODRC placed Dalton on paid administrative leave pending completion of the IME. On April 1, 2010, ODRC sent a letter to the MLS Group of Companies, Inc. ("MLS"), requesting that MLS schedule Dalton for an IME. The letter stated that ODRC was requesting "a complete psychological examination be conducted to determine Mr. Dalton's fitness for duty, given the requirements of his current position as a Psychology Assistant, as well as the requirements of the position of a Psychologist," and noted that Dalton's "[f]itness for duty need[ed] to be considered given the unique safety and security issues associated with the working environment of a prison." (Dalton Depo., State's exhibit J.)

{¶ 11} On April 14, 2010, Dalton received a letter from MLS, informing Dalton that he was scheduled for an IME with Dr. Michael Farrell on May 7, 2010. The letter informed Dalton that he was required to submit to the IME to determine his fitness for duty, and that his refusal to submit to the examination, or refusal to release the results of the examination, could result in Dalton being charged with insubordination.

{¶ 12} On May 11, 2010, Dr. Farrell issued a report of his examination of Dalton. Dr. Farrell noted that ODRC had provided him with, among other documents, the position descriptions for the Psychology Assistant 2 and Psychologist positions at ODRC, the Quill email, and Dr. Hammond's request for the IME. Dr. Farrell noted that,

when Dalton first arrived for the IME "he was resistant to filling out a standard authorization form for my office to release information about his evaluation to MLS Group of Companies, Inc.," but that Dr. Farrell ultimately convinced Dalton to sign the form. (Dalton Depo., State's exhibit T.) Dr. Farrell then noted the following about the interview:

> [Dalton] then refused to take any objective personality testing, including the MMPI-2 and the MCMI as requested, initially stating that it would be inappropriate since he had administered and scored thousands of the MMPI-2. When I explained to him the multiple versions of these instruments and his probable inability to know all the questions on the different versions and which questions weighted on which scales, he then indicated that he found such test to be intrusive. When his various comments were adequately refuted he stated "they will only use it against me!" Unfortunately, no testing was performed and the evaluation was concluded at 1:25 p.m.

(Dalton Depo., State's exhibit T at 6.)

{¶ 13} Dr. Farrell diagnosed Dalton with features of a paranoid personality as an Axis II condition, but stated that "[a] definitive opinion (one within psychological probability) regarding a psychological diagnosis * * * as well as his psychological ability to work as a psychology assistant and/or psychologist cannot be made given his refusal to comply with any objective personality testing secondary to his statements regarding the inappropriateness and intrusiveness." (Dalton Depo., State's exhibit T at 7.) Dr. Farrell concluded his report by noting that "[w]ithout being able to make a DSM-IV diagnosis, [he was] unable to justify any specific impairments which would prevent him from working as a psychology assistant and/or psychologist." (Dalton Depo., State's exhibit T at 8.)

{¶ 14} Dalton asserted at his deposition that Dr. Farrell presented the MMPI-2 test as "optional after the conclusion of the interview." (Dalton Depo., 14.) Dalton explained that he declined Dr. Farrell's offer to take the MMPI-2 test because Dr. Farrell "had already declared [him] fit for duty, and [he] was already out the door," when Dr. Farrell asked Dalton if he would take the MMPI-2. (Dalton Depo., 81.) Dalton also stated that he had administered the MMPI-2 around "500 times," and that he used to

personally take the MMPI along with his other co-workers, and that they "regularly talked about [their] scores" with each other. (Dalton Depo., 61, 172.)

{¶ 15} Following the report from Dr. Farrell, the situation moved from "a clinical assessment to a question of compliance." (Hammond Depo., 114.) On September 28, 2010, ODRC mailed Dalton a letter advising him that he was being removed from his position as a Psychology Assistant 2 at CRC. The letter advised Dalton that he was being removed for violation of the following ODRC rules: Rule 24, interfering with, failing to cooperate in, or lying in an official investigation or inquiry, and Rule 7, failure to follow post orders, administrative regulations, policies or directives. ODRC explained in the letter that the basis for the violations was Dalton's failure to undergo the IME as ordered, based on his refusal to take the MMPI-2 and MCMI tests as directed by Dr. Farrell.

{¶ 16} Dalton grieved his termination pursuant to the collective bargaining agreement in place between ODRC and SEIU/1199, and the grievance proceeded to arbitration. The arbitrator issued a decision on October 28, 2011, denying the grievance and finding just cause to support the termination. The arbitrator rejected Dalton's argument that Dr. Farrell presented the objective personality tests as optional. The arbitrator noted that Dr. Farrell testified that he always includes objective tests in his examinations, "insisted in his testimony that he never offered the MMPI-2 as an option and in fact, spent considerable time attempting to persuade the grievant to take the test or an alternative objective test." (Dalton's Depo., exhibit HH, Arbitration Decision, 21.) As Dr. Farrell had "no motive to be untruthful," the arbitrator concluded that "his testimony must be credited over the testimony of the grievant whose testimony may be influenced by his attempt to protect his job." (Dalton's Depo., exhibit HH, Arbitration Decision, 21-22.)

{¶ 17} ODRC filed a Civ.R. 56 motion for summary judgment on June 14, 2013. ODRC asserted that Dalton's perceived disability discrimination claim failed, as ODRC's act of sending Dalton to the IME did not amount to evidence that ODRC perceived Dalton as disabled. Regarding Dalton's invasion of privacy claims, ODRC noted that Dalton appeared to be asserting invasion of privacy claims based on an invasion into his private thoughts and a public disclosure of private affairs. ODRC asserted that sending

Dalton to the IME was not an invasion of privacy, and that Dalton signed a release to participate in the IME. ODRC also argued that there was no public disclosure of Dr. Farrell's report, as the evidence indicated that, at most, the report was shown to one other ODRC employee. Dalton filed a memorandum contra ODRC's motion for summary judgment on July 1, 2013.

{¶ 18} The trial court issued a decision granting ODRC's motion for summary judgment on August 26, 2013. The court found that plaintiff failed to establish a prima facie case of perceived disability discrimination. The court noted Dalton's contention that "the act of sending him for an IME constitute[d] perceived disability discrimination." (Decision, 5.) Relying on *Peters v. Ohio Dept. of Natural Resources*, 10th Dist. No. 03AP-350, 2003-Ohio-5895 and *Sullivan v. River Valley School Dist.*, 197 F.3d 804 (6th Cir.1999) the court concluded that merely sending Dalton to the IME was not evidence that ODRC perceived Dalton as disabled. (Decision, 5.) The court further noted that, as Dr. Farrell was unable to complete the objective personality testing, Dalton had failed to establish that he could safely and substantially perform the functions of his job. As ODRC complied with Ohio Adm.Code 123:1-30-03 in sending plaintiff to the IME, the court concluded that Dalton could not establish that the IME was a pretext for discrimination. Similarly, because ODRC complied with Ohio Adm.Code 123:1-30-03 in sending Dalton to the IME, the court determined that the IME was not a wrongful intrusion into the seclusion of another. Regarding Dalton's claim for invasion of privacy based on public disclosure of private thoughts, the trial court noted that "plaintiff testified in his deposition that defendant disseminated the report from his IME to Ken Confer, a nurse at DRC." (Decision, 7.) Accordingly, the court concluded that Dalton failed to put forth evidence demonstrating that the results of the IME were publicly disclosed.

## II. ASSIGNMENTS OF ERROR

{¶ 19} Defendant appeals, assigning the following errors:

> 1. The Court erred as a matter of law when it determined the fact that [plaintiff] was sent for a psychological evaluation is not evidence that [plaintiff] was perceived to have a psychological handicap. *Peters v. Ohio Dept. of Natural Resources*, 10th Dist. No. 03AP-350, 2003-Ohio-5895, ¶24

and when it determined and accepted as law, "The Sixth Circuit has explained that an employer's perception that health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled. *Sullivan v. River Valley School Dist.*, 197 F.3d 804, 810-11 (6th Cir. 1999), cert. denied, 530 U.S. 1262, 120 S. Ct. 2718, 147 L. Ed. 2d 983 (2000). And that "a medical exam 'cannot itself prove perception of a disability because it does not prove that the employer perceived the employee to have an impairment that substantially limits one or more of the employee's major life activities.' Id. at 811." *Marziale v. BP Prods. N. Am.*, S.D.Ohio No. 1:05cv741, 2007 U.S. Dist. LEXIS 90730 (November 27, 2007).

2. The Court erred when it determined that only reasonable conclusion is that defendant acted reasonably and complied with the procedures as outlined in OAC § 123:1-30-03 in sending plaintiff to an IME because the OAC § 123:1-30-03 and 123:1-30-01 limits the authority of a State of Ohio Appointing Authority to request medical examinations only for disability separation and reinstatement from disability separation, not a general fitness for duty exam.

3. The Court erred by interpreting The OAC § 123:1-30-03 and OAC § 123:1-30-01 as currently written and enforced as not violating the Americans With Disabilities Act and ORC § 4112 relating to disabilities.

4. The Court erred when it determined Dr. Hammond lawfully recommended an IME because "I wanted to be able to clarify is, you know, is there a problem that's going to keep this individual from being able to work." As acting reasonably and complying with the procedures as outlined in OAC § 123:1-30-03 in sending plaintiff to an IME as construing the facts most strongly in favor of plaintiff when Dr. Hammond testified "To be honest . . . I assumed . . . we would get a clean report back . . . *I didn't have any reason to believe that [he had] a psychological condition*."

5. The Court erred when it determined that without plaintiff's full compliance with the IME, plaintiff cannot establish the third prong of the prima facie case i.e. that he, despite his perceived disability, could safely and substantially perform the essential functions of the job in question.

6. The Court erred when it mistakenly defined claims for invasion of privacy.

7. The Court erred when it applied the false light defamation standard to the Appellant. The Appellant did not plead false light defamation requiring a public disclosure.

8. The Court has erred in requiring that Appellant show that the results of his IME were disclosed in order to show damages.

## III. STANDARD OF REVIEW

{¶ 20} Appellate review of summary judgment motions is de novo. *Helton v. Scioto Cty. Bd. of Commrs.*, 123 Ohio App.3d 158, 162 (4th Dist.1997). "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." *Mergenthal v. Star Bank Corp.*, 122 Ohio App.3d 100, 103 (12th Dist.1997). We must affirm the trial court's judgment if any of the grounds raised by the movant at the trial court are found to support it, even if the trial court failed to consider those grounds. *Coventry Twp. v. Ecker*, 101 Ohio App.3d 38, 41-42 (9th Dist.1995).

{¶ 21} Summary judgment is proper only when the party moving for summary judgment demonstrates that: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in that party's favor. Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997).

{¶ 22} When seeking summary judgment on the ground that the nonmoving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the nonmoving party's claims. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). A moving party does not discharge this initial burden under Civ.R. 56 by simply making a conclusory allegation that the nonmoving party has no evidence to prove its case. *Id.*

Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that the nonmoving party has no evidence to support its claims. *Id.* If the moving party meets this initial burden, then the nonmoving party has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmoving party does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party. *Id.*

## IV. FIRST AND FIFTH ASSIGNMENTS OF ERROR - PERCEIVED DISABILITY DISCRIMNATION PRIMA FACIE CASE

{¶ 23} Dalton's first assignment of error asserts that the trial court erred in finding that ODRC's decision to send Dalton to the IME did not amount to evidence of discrimination on the basis of a perceived psychological disability. Dalton's fifth assignment of error asserts that the trial court erred in finding that Dalton could not establish the third prong of his prima facie case for perceived disability discrimination.

{¶ 24} Disability discrimination in employment is prohibited by R.C. 4112.02 which provides, in pertinent part, that "[i]t shall be an unlawful discriminatory practice * * * [f]or any employer," because of the "disability * * * of any person, to discharge without just cause, * * * or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." R.C. 4112.02(A). R.C. 4112.01 defines "disability" to mean "a physical or mental impairment that substantially limits one or more major life activities, * * * or being regarded as having a physical or mental impairment." R.C. 4112.01(A)(13). Thus, under the plain language of R.C. 4112.01(A)(13), a plaintiff may be disabled if their employer regarded them as having a mental or physical impairment, without regard to whether the employer regarded them as substantially limited in their daily life activities as a result. *See Scalia v. Aldi, Inc.*, 9th Dist. No. 25436, 2011-Ohio-6596, ¶ 24. A "physical or mental impairment" is defined to include "[a]ny mental or psychological disorder, including, but not limited to, * * * emotional or mental illness." R.C. 4112.01(A)(16)(a)(ii).

{¶ 25} Dalton asserts that ODRC discriminated against him on the basis of a perceived disability by sending him to the IME. Dalton does not assert that ODRC

discriminated against him by placing him on paid administrative leave or by terminating his employment. *See Marziale v. BP Prods. N. Am., Inc.*, S.D. Ohio No. 1:05cv741 (Nov. 27, 2007), citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir.1996) (explaining that "an offer of a paid medical leave of absence does not show that an employee was regarded as disabled"); *Sullivan* at 813 (although the school district's "subsequent suspending of Sullivan [was] an adverse job action, it was based on his refusal to undergo the valid examinations, which [was] not a discriminatory reason"). Dalton was terminated pursuant to Ohio Adm.Code 123:1-30-03(D), which states that "[a]n employee's refusal to submit to an examination, * * * amounts to insubordination, punishable by the imposition of discipline up to and including removal."

{¶ 26} To prevail in an employment discrimination case, a plaintiff must prove discriminatory intent. *Gismond v. M & T Mtge. Corp.*, 10th Dist. No. 98AP-584 (Apr. 13, 1999). Discriminatory intent may be proven by either direct or indirect evidence. *Id.* Where a plaintiff relies on indirect evidence, discrimination claims are subject to a version of the burden shifting analysis the United States Supreme Court described in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *see also Coryell v. Bank One Trust Co. N.A.,* 101 Ohio St.3d 175, 2004-Ohio-723, ¶ 9. Under the three-part framework *McDonnell Douglas* articulated, a plaintiff must first present evidence from which a reasonable trier of fact could find a prima facie case of discrimination. *Lindsay v. Yates,* 578 F.3d 407, 415 (6th Cir.2009), citing *Blair v. Henry Filters, Inc.,* 505 F.3d 517, 524 (6th Cir.2007). A prima facie case for perceived disability discrimination required Dalton to establish that: (1) ODRC perceived Dalton as disabled; (2) ODRC took adverse employment action in part because of the perceived disability; and (3) Dalton could safely and substantially perform the essential functions of the job, despite his perceived disability. *See Caldwell v. Ohio State Univ.,* 10th Dist. No. 01AP-997, 2002-Ohio-2393, ¶ 74, citing *Hood v. Diamond Prods., Inc.,* 74 Ohio St.3d 298 (1996), paragraph one of the syllabus. *See also Columbus Civ. Serv. Comm. v. McGlone,* 82 Ohio St.3d 569 (1998).

{¶ 27} Once a plaintiff establishes a prima facie case of disability discrimination, "the burden then shifts to the employer to set forth some legitimate, nondiscriminatory reason for the action taken." *Hood* at 302, citing *Plumbers & Steamfitters Joint*

*Apprenticeship Commt. v. Ohio Civ. Rights Comm.,* 66 Ohio St.2d 192, 197 (1981). "Legitimate, nondiscriminatory reasons for the action taken by the employer may include, but are not limited to, insubordination on the part of the employee claiming discrimination, or the inability of the employee * * * to safely and substantially perform, with reasonable accommodations, the essential functions of the job in question." *Id.* "[I]f the employer establishes a nondiscriminatory reason for the action taken, then the employee * * * must demonstrate that the employer's stated reason was a pretext for impermissible discrimination." *Id.*

{¶ 28} Courts are permitted to look to federal regulations and cases interpreting the Americans with Disabilities Act ("ADA") for guidance when interpreting Ohio law. *McGlone* at 573. However, federal materials may only be utilized "when the terms of the federal statute are consistent with Ohio law or when R.C. Chapter 4112 leaves a term undefined." *Scalia* at ¶ 23, citing *Genaro v. Cent. Transport*, 84 Ohio St.3d 293, 298 (1999).

{¶ 29} Prior to the 2008 amendments, the ADA defined disability, in part, as "a physical or mental impairment that substantially limits one or more major life activities of such individual * * * or being regarded as having such an impairment." Courts interpreted the "regarded as having such an impairment language," to mean an employer regarded an employee as disabled when the employer mistakenly believed that the employee had a physical or mental impairment that substantially limited one or more major life activities. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). In *Scalia,* the court concluded that "[b]ecause the plain language of the definition of disability contained in R.C. 4112.01 differs in substance from the [pre-2008] ADA, it is not appropriate to look to federal materials interpreting the pre-2008 ADA with respect to perceived disability claims under Ohio law." *Id.* at ¶ 25.

{¶ 30} In 2008, the ADA was amended, and the ADA definition of perceived disability now conforms with the R.C. 4112.01(A)(13) definition. The current version of the ADA specifically states that an individual meets the requirement of " 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to

limit a major life activity." 42 U.S.C. 12102(3)(A). *See also Wells v. Cincinnati Children's Hosp. Med. Ctr.*, 860 F.Supp.2d 469, 478 (S.D.Ohio 2012), citing 29 C.F.R. 1630.2(g)(3) (explaining that "[i]n contrast to the pre-amendment statute, under the ADAAA, a plaintiff proceeding under the 'regarded as' prong only has to prove the existence of an impairment to be covered under the Act; she no longer is required to prove that the employer regarded her impairment as substantially limiting a major life activity").

{¶ 31} The trial court correctly determined that Dalton could not establish a prima facie case of perceived disability discrimination, as both Ohio and federal courts have concluded that merely sending an employee to an IME, or other type of fitness for duty examination, does not amount to evidence that the employer perceived the employee as disabled. *See Peters* at ¶ 24 (noting that the fact that the appointing authority sent an employee "for a psychological evaluation is not evidence that she was perceived to have a psychological handicap"); *Sullivan* at 808 (noting that "an employer's ordering an employee to undergo mental and physical examinations does not suffice to show that an employer regards an employee as disabled"); *James v. Goodyear Tire & Rubber Co.*, 354 Fed.Appx. 246, 249 (6th Cir.2009) (noting that "[a] valid FCE [functional capacity evaluation] demand cannot constitute an adverse employment action in general discrimination claims, like the one James brings"); *Mickens v. Polk Cty. School Bd.*, 430 F.Supp.2d 1265, 1274 (M.D. Fla.2006) (noting that "the School Board's request that Mickens undergo a psychological evaluation fails to establish that the School Board regarded Mickens as disabled"); *Kocsis* at 885 (noting that "[w]hile the defendant may have perceived that [the plaintiff's] health problems were adversely affecting her job performance, there is no evidence that the defendant regarded [the plaintiff] as being unable to care for herself or to perform all of the duties of her job"). As Dalton asserts that ODRC perceived him as disabled because it sent him to the IME, and merely sending an employee to an IME is not evidence that the employer regarded the employee as disabled, Dalton has failed to establish the first element of his prima facie case of perceived disability discrimination.

{¶ 32} Dalton attacks the trial court's conclusion that sending Dalton to the IME was not evidence that ODRC perceived Dalton as disabled, by asserting that the court's reliance on *Peters* and *Sullivan* was misplaced. Dalton notes that both cases predate the

2008 amendments to the ADA, and notes that the "current cases no longer contain the applicable standard of 'major life activities' but rather the standard is now a significantly different 'a physical or mental impairment.' " (Appellant's brief, 17.) Dalton is correct that *Peters* and *Sullivan* both concerned the pre-2008 version of the ADA. However, Dalton ignores the fact that the trial court did not rely on *Peters* or *Sullivan* for the proposition that an individual can only be perceived as disabled if their employer perceives them as having a physical or mental impairment which substantially limits a major life activity. Rather, the trial court cited those cases for the above-noted proposition, that merely requesting and sending an employee to an IME does not amount to evidence that the employer perceived the employee as disabled. The court did not base its holding on the substantially limiting a major life function language from the pre-2008 version of the ADA. Accordingly, Dalton's contention that the court erred by relying on *Peters* and *Sullivan* is misplaced.

{¶ 33} The trial court also determined that, as Dalton refused to undergo objective psychological testing during the IME, Dalton could not establish the third prong of the prima facie case; that, despite his perceived disability, he could safely and substantially perform the essential functions of the job in question. *See Whitlow v. Ingram*, 7th Dist. No. 93 C.A. 74 (Nov. 7, 1994), citing *Clover v. The Columbus Retail Merchants Delivery, Inc.*, 115 Ohio App. 467 (10th Dist.1962) (holding that an issue of fact or law determined in a binding arbitrator's decision is res judicata in a later court action). Dalton asserts, without support, that "absent evidence to the contrary, an employee is presumed to be able to perform their job." (Appellant's brief, 43.) We disagree. Dalton filed the action against ODRC alleging perceived disability discrimination. Dalton thus had the burden to establish the elements of his prima facie case. Accordingly, in responding to ODRC's motion for summary judgment, Dalton had to cite specific facts demonstrating that he could safely and substantially perform the essential functions of his job. Dalton was not obligated to rely on the IME results to make this showing, but Dalton was obligated to put forth some evidence to establish that he could safely and substantially perform the essential functions of his job. Dalton failed to present any evidence to establish this element, and the trial court correctly

determined that he failed to establish a prima facie case of perceived disability discrimination.

{¶ 34} Based on the foregoing, Dalton's first and fifth assignments of error are overruled.

## IV.   SECOND, THIRD, AND FOURTH ASSIGNMENTS OF ERROR – OHIO ADM.CODE 123:1-30-03 AND THE IME

{¶ 35} Dalton's second and fourth assignments of error assert that the trial court erred in concluding that ODRC complied with Ohio Adm.Code 123:1-30-03 in sending Dalton to the IME. Dalton's third assignment of error asserts the trial court erred by finding that Ohio Adm.Code 123:1-30-03 and 123:1-30-01 do not violate the ADA or R.C. 4112.02.

{¶ 36} Ohio Adm.Code 123:1-30-03 provides that "[a]n appointing authority may require that an employee submit to medical or psychological examinations for purposes of disability separation or a reinstatement from disability separation." Ohio Adm.Code 123:1-30-03(A). Ohio Adm.Code 123:1-30-01 describes the procedures for involuntary disability separation, and Ohio Adm.Code 123:1-30-02 describes the procedures for voluntary disability separation. Both code sections provide for disability separation when the employee is unable to perform the essential job duties of their position. "An involuntary disability separation occurs when an appointing authority has received substantial credible medical evidence of the employee's disability and determines that the employee is incapable of performing the essential job duties of the employee's assigned position due to the disabling illness, injury or condition." Ohio Adm.Code 123:1-30-01(A). An appointing authority must require that an employee submit to an examination under Ohio Adm.Code 123:1-30-03 prior to involuntarily disability separating the employee, unless the appointing authority has other evidence of the disability. Ohio Adm.Code 123:1-30-01(B).

{¶ 37} "Prior to any examination," conducted under Ohio Adm.Code 123:1-30-03, the appointing authority must "supply the examining practitioner with facts relating to the perceived disabling illness, injury or condition," and "supply physical and mental requirements of the employee's position; duty statements; job classification

specifications; and position descriptions." Ohio Adm.Code 123:1-30-03(B). *Compare* 42 U.S.C. 12112(d)(4)(A) (under the ADA "[a] covered entity shall not require a medical examination * * *, unless such examination or inquiry is shown to be job-related and consistent with business necessity"). Dalton asserts that under Ohio Adm.Code 123:1-30-03(B) "the appointing authority [must] make at least two determinations." (Appellant's brief, 23.) The first is that the "employee's job performance is below the ability to perform the essential job duties of the position," and the second is that "there is some articulable conduct 'relating to the perceived disabling illness, injury or condition.' " (Appellant's brief, 23.)

{¶ 38} We note that a court interprets an administrative rule in the same manner it would interpret a statute. *McFee v. Nursing Care Mgt. of Am., Inc.,* 126 Ohio St.3d 183, 2010-Ohio-2744, ¶ 27. We first look to the plain language of the administrative rule. *Sugarcreek Twp. v. Centerville,* 133 Ohio St.3d 467, 2012-Ohio-4649, ¶ 19; *In re M.W.,* 133 Ohio St.3d 309, 2012-Ohio-4538, ¶ 17. When that language is unambiguous, we apply the administrative rule as written. *Id.* " 'The interpretation of statutes and administrative rules should follow the principle that neither is to be construed in any way other than as the words demand.' " *State ex rel. Baroni v. Colletti,* 130 Ohio St.3d 208, 2011-Ohio-5351, ¶ 18, quoting *Morning View Care Ctr.-Fulton v. Ohio Dept. of Human Servs.,* 148 Ohio App.3d 518, 2002-Ohio-2878, ¶ 36 (10th Dist.).

{¶ 39} Ohio Adm.Code 123:1-30-03(B) is unambiguous. It requires simply that the appointing authority provide the examining practitioner with facts relating to the perceived illness and the requirements of the employee's position before the employee must undergo the examination. Dalton asserts that ODRC had to find that Dalton was unable to perform the essential job duties of his position before it could request the IME. We disagree. There is nothing in the code which indicates that the appointing authority must have evidence that the employee is unable to perform their essential job duties before the appointing authority may request an examination under Ohio Adm.Code 123:1-30-03. The appointing authority may not involuntarily disability separate the employee until the appointing authority has substantial credible medical evidence demonstrating that the employee can no longer perform the essential duties of their position due to the disabling illness. Herein, however, ODRC never moved to

involuntarily disability separate Dalton, and thus never had to establish that Dalton was unable to perform his essential job duties due to a disabling illness, because ODRC fired Dalton for refusing to submit to the IME.

{¶ 40} ODRC sent Dalton to the IME precisely because his odd behavior caused ODRC to have "significant concern that Mr. Dalton may be unable to perform the essential functions of his current position as a Psychology Assistant or the essential functions of the position we will have to reclassify him to as a Psychologist." (Dalton's Depo., State's exhibit J.) As a psychological assistant conducting mental health assessments of prison inmates, Dalton's own mental stability was essential to Dalton's ability to perform his job duties. "[A]n employer needs to be able to determine the cause of an employee's aberrant behavior * * * without exposing themselves to ADA claims" or perceived disability discrimination claims under R.C. 4112.02. *Sullivan* at 811. ODRC was entitled to request the IME pursuant to Ohio Adm.Code 123:1-30-03 to determine whether, in light of Dalton's odd behavior, Dalton could perform his essential job duties.

{¶ 41} Dalton also indicates that ODRC could only request the IME pursuant to Ohio Adm.Code 123:1-30-03 if ODRC was going to proceed with a disability separation. Dr. Hammond stated that he requested the IME "to, in an investigating way, try to determine if there is something that we should pursue in terms of disability separation." (Hammond Depo., 11.) Although Ohio Adm.Code 123:1-30-03(A) states that an appointing authority may require an employee to submit to an examination for purposes of disability separation, the code does not obligate the appointing authority to proceed with a disability separation if the results of the examination reveal that the employee is not disabled. Indeed, if the results of the requested IME reveal that the employee is capable of performing their essential job duties, the appointing authority may not involuntarily disability separate the employee. *See* Ohio Adm.Code 123:1-30-01(D) (explaining that if the evidence at the pre-separation hearing demonstrates "that the employee is capable of performing his or her essential job duties, then the involuntary disability process shall cease and the employee shall be considered fit to perform his or her essential job duties").

{¶ 42} Ohio Adm.Code 123:1-30-03(B) requires only that the appointing authority supply the examining practitioner with facts relating to the perceived injury,

illness, or condition and with documentation describing the requirements of the job for which the employee is being evaluated, prior to the examination. ODRC complied with Ohio Adm.Code 123:1-30-03(B) when it supplied MLS with Dr. Hammond's letter to Warden Lamneck detailing Dalton's odd behavior, the Quill email, and the position descriptions describing the job duties and worker characteristics for the Psychological Assistant 2 and Psychologist positions.

{¶ 43} Based on the foregoing, Dalton's second and fourth assignments of error are overruled.

{¶ 44} Dalton's third assignment of error asserts that the court erred by interpreting Ohio Adm.Code 123:1-30-03 and 123:1-30-01 as not violating the ADA or R.C. 4112.02. Dalton never argued that the cited code sections violated the ADA or R.C. 4112.02 in the court below, and the trial court accordingly never made a ruling on this argument. Dalton's argument in support of his third assignment of error consists of several citations to Dr. Hammond's testimony, and contends that "no reasonable fact finder could conclude that the Appellee had a scintilla of adverse performance or inappropriate conduct by himself or toward others that would permit an IME request under OAC § 123:1-30-03 and § 123:1-30-01." (Appellant's brief, 38.) While we disagree with Dalton's contention, as Dr. Hammond's interaction with Dalton and Dalton's statements in the Quill email provided ODRC with a firm basis on which to request the IME, we note that "this court rules on assignments of error only, and will not address mere arguments." *Ellinger v. Ho,* 10th Dist. No. 08AP-1079, 2010-Ohio-553, ¶ 70, citing *In re Estate of Taris,* 10th Dist. No. 04AP-1264, 2005-Ohio-1516, ¶ 5. Accordingly, Dalton's third assignment of error is overruled.

## VI.   SIXTH, SEVENTH, AND EIGHTH ASSIGNMENTS OF ERROR – INVASION OF PRIVACY

{¶ 45} Dalton's sixth assignment of error asserts that the trial court incorrectly defined Dalton's claims for invasion of privacy. Dalton's seventh assignment of error asserts the trial court erred by applying a false light defamation standard to Dalton's invasion of privacy claims, as Dalton did not plead false light defamation. Dalton's

eighth assignment of error asserts the trial court erred by requiring Dalton to show that the results of the IME were publicly disclosed in order to show damages.

{¶ 46} Until 2007, Ohio recognized three actionable types of invasion of privacy claims: "the unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Housh v. Peth,* 165 Ohio St. 35 (1956), paragraph two of the syllabus. In 2007, the Supreme Court of Ohio recognized a fourth theory, the "false light" invasion of privacy theory. *Welling v. Weinfeld,* 113 Ohio St.3d 464, 2007-Ohio-2451, syllabus. Under a false light theory, "[o]ne who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Welling* at syllabus, adopting Restatement of the Law 2d, Torts, Section 652E (1997).

{¶ 47} Dalton asserts that the trial court mistakenly defined the claims for invasion of privacy. We have reviewed the trial court's decision, and find that the court correctly defined the claims for invasion of privacy. In his argument under his sixth assignment of error, Dalton cites to the syllabus language from *Housh* and *Welling* and notes that an invasion of privacy requires evidence of a wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities. In defining invasion of privacy premised on the wrongful intrusion into the seclusion of another, the trial court noted that, in order to prove an invasion of privacy claim, one must prove "a 'wrongful intrusion into one's private activities in a manner that outrages or causes mental suffering, shame, or humiliation to a person of ordinary sensibilities.' *Peitsmeyer v. Jackson Twp. Bd. of Trustees,* 10th Dist. No. 02AP-1174, 2003-Ohio-4302, ¶ 26." (Decision, 7.) Dalton's sixth assignment of error is overruled.

{¶ 48} Dalton asserts that the trial court applied a false light defamation standard to his invasion of privacy claims, despite that Dalton did not plead a cause of action for false light defamation. Aside from mentioning that false light publicity is one of the four types of invasion of privacy claims, the court did not otherwise mention false light invasion of privacy or apply the false light invasion of privacy standard to Dalton's invasion of privacy claims. The trial court only analyzed the invasion of privacy claims that plaintiff plead: wrongful intrusion into the seclusion of another and public disclosure of one's private affairs. Dalton's seventh assignment of error is overruled.

{¶ 49} Dalton's eighth assignment of error asserts the trial court erred in requiring Dalton to establish that the results of his IME were publicly disclosed in order to show damages. To establish an invasion of privacy through publicity, the plaintiff must prove five elements: (1) communication of the matter to the public at large or to so many persons that the matter is substantially certain to become one of public knowledge, (2) disclosure of facts concerning the individual's private life, (3) the matter publicized must be highly offensive and objectionable to a reasonable person of ordinary sensibilities, (4) the communication must be intentional, not negligent, and (5) the matter publicized is not of legitimate concern to the public. *Killilea v. Sears, Roebuck & Co.,* 27 Ohio App.3d 163, 166-67 (10th Dist.1985). Accordingly, plaintiff must show a public disclosure in order to show an invasion of privacy claim based on public disclosure of private affairs. The trial court determined that there was not a public disclosure of Dr. Farrell's report, as Dalton testified that the only person he knew of who had seen the report was Ken Confer, a nurse at ODRC. *See also Clark v. Clark*, 6th Dist. No. H-05-006, 2005-Ohio-5252, ¶ 14.

{¶ 50} Dalton's argument under his eighth assignment of error asserts that the court erred in finding that Dalton did not submit to the MMPI-2 test during the IME, that Dalton's release to participate in the IME was subject to revocation at any time, that the entire IME process was unwarranted and illegal, and that, because Dalton had "knowledge of what an IME may reveal * * *, it naturally follows that outrage, mental suffering, shame and humiliation to the Appellant * * * was a certainty." (Appellant's brief, 50.) Appellant's arguments under his eighth assignment of error do not relate to the assigned error regarding the public disclosure requirement. As noted above, this

court rules only on assigned errors and not mere arguments. *Ellinger*. Accordingly, Dalton's eighth assignment of error is overruled.

## VII. DISPOSITION

{¶ 51} Having overruled Dalton's eight assignments of error, we affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

O'GRADY and LUPER SCHUSTER, JJ., concur.

_____