[Cite as *Anderson v. Bright Horizons Children's Ctrs., L.L.C.*, 2022-Ohio-1031.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Haley Anderson, | : | |
| Plaintiff-Appellant, | : | |
| | : | No. 20AP-291 |
| v. | : | (C.P.C. No. 18CV-7299) |
| Bright Horizons Children's Centers, LLC et al., | : | (REGULAR CALENDAR) |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

D E C I S I O N

Rendered on March 29, 2022

**On brief:** *Willis Spangler Starling*, *Jason E. Starling*, *Ashley Rutherford Starling*; *Law Offices of John C. Camillus, LLC*, and *John C. Camillus*, for appellant. **Argued:** *John C. Camillus*.

**On brief:** *Littler Mendelson, P.C.*, and *Angelique Paul Newcomb*, for appellees Bright Horizons Children's Centers, LLC and Carrie Delaney. **Argued:** *Angelique Paul Newcomb*.

**On brief:** *Elfvin, Klingshirn, Royer & Torch, LLC*, and *Christina M. Royer*, for Amicus Curiae, Ohio Employment Lawyers Association.

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Plaintiff-appellant, Haley Anderson, appeals a judgment of the Franklin County Court of Common Pleas that granted summary judgment to defendants-appellees, Bright Horizons Children's Centers, LLC, and Carrie Delaney. For the following reasons,

we affirm that judgment in part and reverse it in part, and we remand this case to the trial court.

{¶ 2}   Since birth, Anderson has suffered from a heart defect consisting of two genetic deformities:  (1) a coarctation, or narrowing, of her aorta and (2) a bicuspid, rather than tricuspid, aortic valve.  As a newborn, Anderson underwent surgery to repair the abnormally narrow section of her aorta.  Nevertheless, the coarctation of Anderson's aorta causes Anderson to have high blood pressure.

{¶ 3}   Because Anderson has a bicuspid aortic valve, the blood flow through Anderson's aortic valve is restricted.  Also, the abnormality in the valve closure allows blood to "leak" back into her heart instead of flowing out into her body.  Due to these problems with Anderson's circulatory system, her heart is more susceptible to bacterial infection spreading from other parts of her body.  Because of this susceptibility, Anderson needs to seek medical treatment for any infection she suffers.

{¶ 4}   In March 2017, Bright Horizons hired Anderson to work as an infant room teacher in its childcare center at Riverside Methodist Hospital ("the Riverside center").  At various times while working at the Riverside center, Anderson developed symptoms of a sinus infection and visited a medical provider for treatment.  Due to illness, Anderson was absent from work on April 10, 2017; April 25 and 26, 2017; May 18, 2017; May 24, 2017; June 20, 2017; and June 28 and 29, 2017.  After each absence, Anderson provided her supervisor, Carrie Delaney, with a note from a medical provider excusing her absence.

{¶ 5}   On Monday, July 10, 2017, Anderson called Delaney to report that she had a respiratory infection and would not be attending work.   During that telephone conversation, Anderson told Delaney, "I do have a congenital heart defect and I found out today that that may be a reason why my immune system may not be as built up."  (Ex. 7, Pl.'s Memo in Opp. to Summ. Jgmt.)  This conversation constituted the first time Anderson had disclosed her congenital heart defect to Delaney.

{¶ 6}   When Anderson returned to work on Wednesday, July 12, 2017, she met with Delaney, the director of the Riverside center, and Lyndsay Truax, the assistant director of the Riverside center.  During the meeting, Delaney told Anderson that her absenteeism had become excessive, and consequently, she was not providing the consistency of care critical for the children attending the center.  Delaney suggested that Anderson move to the

substitute pool, which would allow Anderson to choose the days she wanted to work. According to Anderson, Delaney also suggested that Anderson consider resigning from Bright Horizons.[1] The way in which Delaney suggested resignation made Anderson feel like Delaney was threatening her job.

{¶ 7} In addition to confronting Anderson about her absenteeism, Delaney also reprimanded her about cell-phone usage in the July 12, 2017 meeting. Earlier in the day, Truax had observed Anderson talking on her cell phone when she was supposed to be teaching in the classroom, which was against Bright Horizons' policy. This reprimand constituted the first time Delaney had disciplined Anderson for a work policy violation.

{¶ 8} On Anderson's next scheduled workday, Friday, July 14, 2017, she arrived at the Riverside center, but she was suffering from a migraine, nausea, shortness of breath, and severe anxiety. She waited in Delaney's office for approximately 20 minutes before telling another employee to let Delaney know that she was ill and leaving to obtain medical care. Anderson then sought treatment at the emergency room of Riverside Methodist Hospital.

{¶ 9} Later that day, at Anderson's request, Anderson's mother, Melody Anderson, telephoned Delaney to provide Delaney with details about Anderson's absence from work. Melody Anderson told Delaney that Anderson was receiving treatment in the emergency room for high blood pressure, fluid in her lungs, migraine, and anxiety. Melody Anderson also discussed with Delaney Anderson's congenital heart defect, and disclosed to Delaney the surgery that Anderson had undergone as an infant. Melody Anderson informed Delaney that Anderson's congenital heart defect negatively affected her immune system, and admonished Delaney that allowing feverish children into the Riverside center contributed to Anderson's risk of infection. Finally, Melody Anderson asked Delaney not to hold Anderson's heart defect against her.

{¶ 10} In the late afternoon of Friday, July 14, 2017, Truax emailed the schedule for the next week, beginning Monday, July 17, 2017, to the Riverside center teachers. Truax did not include Anderson on the schedule because she did not know if Anderson "was coming back to work." (Truax Dep. at 70.) When Anderson saw that Truax had removed her from the schedule, she assumed that Bright Horizons had fired her.

---

[1] Truax denies that this occurred.

{¶ 11} Anderson did not go to the Riverside center on Monday, July 17, 2017, or Tuesday, July 18, 2017. However, Anderson called the Riverside center multiple times to speak with Delaney or Truax. After repeatedly failing to connect with either Delaney or Truax, Anderson concluded that they were "dodg[ing]" her phone calls. (Anderson Dep. at 304.)

{¶ 12} In the meantime, Charlotte Lane, a Bright Horizons' human resources business partner generalist, contacted Anderson by email and informed Anderson that she would like to discuss Anderson's concerns with her. Lane had previously tried to call Anderson, but Anderson did not answer the phone and her voicemail box was full. Anderson responded to Lane's email on July 18, 2017 and asked Lane to provide times she was available to speak. Lane replied with two different time windows, but Anderson never called Lane or otherwise responded to Lane's email.

{¶ 13} On July 20, 2017, Delaney sent Anderson a letter informing her that Bright Horizons had determined that she had voluntarily resigned her job because she had not reported to work and did not call in to report her absence on July 14, 17, and 18, 2017.[2] The letter further notified Anderson that Bright Horizons accepted her resignation.

{¶ 14} Anderson filed suit against Bright Horizons and Delaney on August 27, 2018. In her complaint, Anderson asserted claims for disability discrimination in violation of R.C. 4112.02. She maintained that defendants violated Ohio law by discriminating against her in the termination of her employment, failing to accommodate her alleged disability, and failing to engage in the interactive process to determine a reasonable accommodation for her alleged disability. Anderson also brought a claim against Delaney alone for violation of R.C. 4112.02(J), contending that Delaney aided, abetted, incited, compelled, or coerced the disability discrimination allegedly perpetuated by Bright Horizons.

{¶ 15} After the completion of discovery, defendants moved for summary judgment. Anderson opposed that motion. In a judgment dated April 30, 2020, the trial court granted defendants summary judgment on all claims.

{¶ 16} Anderson now appeals, and she assigns the following errors:

---

[2] Bright Horizons later conceded that Anderson had notified Delaney regarding her absence on July 14, 2017, and consequently, it had erred in adding the July 14 date to the letter.

1. The trial court committed reversible error by granting Defendants-Appellees summary judgment on Count I for disability discrimination in employment.

2. The trial court committed reversible error by granting Defendants-Appellees summary judgment on Count II for regarded-as disability discrimination in employment.

3. The trial court committed reversible error by granting Defendants-Appellees summary judgment on Count III for failure to accommodate a disabled employee.

4. The trial court committed reversible error by granting Defendants-Appellees summary judgment on Count IV for failure to engage in the interactive process with a disabled employee.

5. The trial court committed reversible error by granting Defendants-Appellees summary judgment on Count V for aiding and abetting disability discrimination in employment.

6. The trial court committed reversible error by sanctioning Plaintiff with the exclusion of evidence because Plaintiff objected to the production of, and temporarily withheld, an audio recording of Defendant-Appellee Carrie Delaney until after she was deposed and had testified inconsistently with the audio recording.

7. The trial court committed reversible error on e-discovery by refusing to compel Defendants-Appellees to produce all e-mails and text messages responsive to the search terms "Haley," "Anderson," "disability," "congenital," "heart," or "defect" in a case about Haley Anderson's disability of a congenital heart defect.

8. The trial court committed reversible error on e-discovery by denying Plaintiff-Appellant a forensic inspection even though defense counsel fabricated a "no paper trail" policy that supposedly accounted for their clients' miniscule nine-page e-discovery production.

{¶ 17} Anderson's first five assignments of error challenge the trial court's decision to grant defendants summary judgment. A trial court must grant summary judgment under Civ.R. 56 when the moving party demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable

minds can come to but one conclusion when viewing the evidence most strongly in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party. *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, ¶ 29; *Sinnott v. Aqua-Chem, Inc.*, 116 Ohio St.3d 158, 2007-Ohio-5584, ¶ 29. Appellate review of a trial court's ruling on a motion for summary judgment is de novo. *Hudson* at ¶ 29. This means that an appellate court conducts an independent review, without deference to the trial court's determination. *Zurz v. 770 W. Broad AGA, LLC*, 192 Ohio App.3d 521, 2011-Ohio-832, ¶ 5 (10th Dist.); *White v. Westfall*, 183 Ohio App.3d 807, 2009-Ohio-4490, ¶ 6 (10th Dist.).

**{¶ 18}** The party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The moving party does not discharge this initial burden under Civ.R. 56 by simply making conclusory allegations. *Id.* Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* If the moving party meets its burden, then the nonmoving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial. Civ.R. 56(E); *Dresher* at 293. If the nonmoving party does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party. *Dresher* at 293.

### A. Disability Discrimination in Violation of R.C. 4112.02(A)

**{¶ 19}** We will address Anderson's first and second assignments of error together because they both relate to Anderson's claim that defendants terminated her employment because of her disability in violation of R.C. 4112.02(A). Anderson argues that genuine issues of material fact preclude the grant of summary judgment in defendants' favor on that claim. We agree.

**{¶ 20}** Disability discrimination in employment is prohibited by R.C. 4112.02, which provides, in relevant part, that "[i]t shall be an unlawful discriminatory practice * * * [f]or any employer, because of the * * * disability * * * of any person, to discharge without just cause, * * * or otherwise to discriminate against that person with respect to * * * terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." R.C. 4112.02(A). To recover on a claim for disability discrimination under

R.C. 4112.02(A), a plaintiff must demonstrate that: (1) he or she was disabled; (2) the employer took an adverse employment action against the plaintiff, at least in part, because the plaintiff was disabled; and (3) the plaintiff, though disabled, can safely and substantially perform the essential functions of the job in question. *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St.3d 569, 571 (1998), citing *Hazlett v. Martin Chevrolet, Inc.*, 25 Ohio St.3d 279, 281 (1986).

### 1. Is Anderson Disabled?

{¶ 21} R.C. 4112.01 contains three meanings for the term "disability:" (1) "a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working;" (2) "a record of a physical or mental impairment;" and (3) "being regarded as having a physical or mental impairment." R.C. 4112.01(A)(13). The definition of "physical or mental impairment" includes "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting" the cardiovascular system. R.C. 4112.01(A)(16)(a)(i).

{¶ 22} Here, Anderson initially argues that she presented evidence that she is disabled under the first definition of "disability," i.e., her congenital heart defect is a physical impairment that substantially limits one or more major life activities. However, Anderson does not contend that her congenital heart defect substantially limits any of the major life activities listed in R.C. 4112.01(A)(13), which "includ[e] the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Anderson, instead, maintains that her congenital heart defect constitutes a "disability" because it substantially limits a "major life activity" as that phrase is defined in the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA").

{¶ 23} Since its enactment in 1990, the Americans with Disabilities Act ("ADA") has defined "disability" to include "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. 12102(2)(A) (1990), Pub. L. No. 101-336, Section 3, 104 Stat. 329 (current version at 42 U.S.C. 12102(1)(A)). Nevertheless, until its amendment in 2008, the ADA said nothing regarding what kind of activities constituted "major life activities." Although the ADAAA does not actually define the phrase "major life activity," it provides some explication. First, the ADAAA includes a

non-exhaustive list of major life activities, largely lifted from prior EEOC regulation interpreting the ADA:

> [M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

42 U.S.C. 12102(2)(A). Second, the ADAAA states that, "a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. 12102(2)(B).

{¶ 24} Anderson asserts that the major life activities at issue in this case are the operation of major bodily functions. Specifically, Anderson claims she is disabled because her congenital heart defect substantially limits the operation of her circulatory and cardiovascular functions. Anderson urges us to interpret R.C. 4112.01(A)(13) as including the operation of major bodily functions as major life activities.

{¶ 25} According to Anderson, Ohio courts apply the ADAAA to disability discrimination claims brought under R.C. 4112.02. This is an overstatement. Rather, Ohio courts considering disability discrimination claims under R.C. 4112.02 look to federal cases and regulations interpreting the ADA or ADAAA for guidance in interpreting Ohio law. *McGlone*, 82 Ohio St.3d at 573; *Dalton v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 13AP-827, 2014-Ohio-2658, ¶ 28. Federal case law and regulations have persuasive value in cases involving comparable federal statutes and R.C. Chapter 4112 provisions. *Hauser v. Dayton Police Dept.*, 140 Ohio St.3d 268, 2014-Ohio-3636, ¶ 14. But Anderson is not really asking us to look to federal case law and regulation to interpret R.C. 4112.01(A)(13). Anderson instead would have us construe the meaning of R.C. 4112.01(A)(13) by relying on a federal statute with text that varies substantially from the comparable Ohio statute.

{¶ 26} Unlike 42 U.S.C. 12102(2), R.C. 4112.01(A)(13) does not state that the operation of a major bodily function is a major life activity. R.C. 4112.01(A)(13) contains a list of major life activities similar to the list in 42 U.S.C. 12102(2)(A). However, R.C. 4112.01(A)(13) does not create a second category of major life activities for major bodily functions like 42 U.S.C. 12102(2)(B) does.

{¶ 27} In interpreting statutes, courts cannot extend a statute beyond what is written because it is the duty of the court to give effect to the words used in the statute, not to delete words used or insert words not used. *Hall v. Banc One Mgt. Corp.*, 114 Ohio St.3d 484, 2007-Ohio-4640, ¶ 24; *Sarmiento v. Grange Mut. Cas. Co.*, 106 Ohio St.3d 403, 2005-Ohio-5410, ¶ 29. Courts cannot expand the scope of a statute beyond that which the General Assembly enacted. *Sarmiento* at ¶ 29. We, consequently, cannot engraft onto R.C. 4112.01(A)(13) a second category of major life activities for major bodily functions. We must leave it to the General Assembly to decide whether to so broaden the definition of "disability."

{¶ 28} Applying Ohio law, we conclude that Anderson has not demonstrated that her congenital heart defect substantially limits a major life activity. Anderson, therefore, is not disabled under the first definition of "disability."

{¶ 29} At this point, we can overrule Anderson's first assignment of error. Under Anderson's interpretation of her complaint, she has pled two claims for employment discrimination under R.C. 4112.02(A): one claim premised on the assertion she is disabled because she has a physical impairment that substantially limits a major life activity and the second claim premised on the assertion that she is disabled because defendants regarded her as having a physical impairment. Anderson's first assignment of error challenges the trial court's grant of summary judgment on the first claim. Because we have rejected Anderson's contention that she is actually disabled, we conclude the trial court did not err in its ruling on her first claim, and we overrule the first assignment of error.

{¶ 30} We resume our analysis by considering whether the evidence establishes that Anderson is disabled under the third definition of "disability," i.e., defendants regarded her as having a physical impairment. Under the plain language of R.C. 4112.01(A)(13), a plaintiff may be disabled if the employer regarded the plaintiff as having a mental or physical impairment, without regard to whether the employer regarded the plaintiff as substantially limited in his or her major life activities. *Ames v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 14AP-119, 2014-Ohio-4774, ¶ 24; *Dalton* at ¶ 24. Thus, to show that an employer regarded the plaintiff as disabled, the plaintiff need only present evidence that the employer believed the plaintiff had a "physical or mental impairment," as that phrase is defined in R.C. 4112.01(A)(16). *See Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d

308, 319 (6th Cir.2019); *accord Mancini v. Providence*, 909 F.3d 32, 46 (1st Cir.2018) ("[A] plaintiff must show * * * that his employer was either aware of or perceived the impairment at the time of the allegedly discriminatory action."); *Adair v. Muskogee*, 823 F.3d 1297, 1306 (10th Cir.2016) (holding that the plaintiff must show "the employer was aware of and therefore perceived the impairment at the time of the alleged discriminatory action").[3]

{¶ 31} As we stated above, the definition of "physical or mental impairment" includes "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting" the cardiovascular system. R.C. 4112.01(A)(16)(a)(i). Anderson presented evidence that her congenital heart defect is a physiological condition that affects her cardiovascular system. Defendants do not contest that Anderson's congenital heart defect qualifies as a physical impairment under R.C. 4112.01(A)(16).

{¶ 32} Anderson also provided evidence that she told Delaney, her supervisor, about her congenital heart defect about a week prior to the end of her employment. Anderson's mother discussed Anderson's heart defect with Delaney in a telephone conversation after Anderson's initial disclosure. Delaney admitted that she knew about Anderson's congenital heart defect before Anderson's employment with Bright Horizons ended. Anderson, therefore, has presented evidence creating a question of fact regarding whether defendants believed Anderson had a physical impairment at the time of the alleged discriminatory action.

{¶ 33} Defendants contest this conclusion by pointing out that Anderson failed to give Bright Horizons any documentation to substantiate her condition or show it caused her absences. However, a question of fact arose regarding whether defendants believed Anderson had a physical impairment once Anderson informed Delaney about her congenital heart defect. *Jakomas v. Pittsburgh*, 342 F.Supp.3d 632, 650 (W.D.Pa.2018) ("[E]mployer knowledge of an individual's impairment is sufficient to create a material factual dispute as to whether the employer 'regarded' the individual as disabled."). Anderson did not have to substantiate her medical condition with documentation to create a question of fact sufficient to survive summary judgment.

---

[3] In 2008, Congress amended the definition of disability for "regarded as" claims so that it now conforms with the R.C. 4112.01(A)(13) definition. *Dalton* at ¶ 30. Consequently, we may look to federal precedent for guidance in determining what a plaintiff must show to prove that an employer regarded him or her as having a physical (or mental) impairment.

{¶ 34} Defendants also argue that they could not regard Anderson as disabled because when she returned to work after suffering from sinus infections, she produced medical notes showing she could work without restriction. However, in the cases defendants rely on, the plaintiffs provided medical notes that returned the plaintiffs to work without restriction for the alleged disability at issue in the case. In *Nichols v. OhioHealth Corp.*, S.D.Ohio No. 2:14-cv-2796 (Aug. 17, 2017), the plaintiff was returned to work without restriction after a knee injury. In *Gleason v. Food City 654*, E.D.Tenn. No. 3:13-CV-712-PLR-HBG (Apr. 22, 2015), the plaintiff was returned to work without restriction in relation to a back strain. When those plaintiffs later claimed their employers regarded them as disabled due to the employers' knowledge of the plaintiffs' injuries, the courts found the employers' receipt of notes clearing the plaintiffs to work without restrictions precluded the plaintiffs' "regarded as" claims.

{¶ 35} Here, unlike in *Nichols* and *Gleason*, Anderson is not claiming her sinus infections, for which she was cleared to return to work without restriction, as a disability. Anderson, instead, is asserting that defendants regarded her as disabled due to her congenital heart defect. Defendants did not receive any medical note returning Anderson to work without restriction after an absence to treat her congenital heart defect. Consequently, defendants in this case had no reason to believe that the ongoing condition Anderson suffered from—a congenital heart defect—had resolved itself because she had produced a note returning her to work without restriction after an acute infection. Therefore, we do not find *Nichols* or *Gleason* applicable to this case.

{¶ 36} In sum, we find that Anderson has presented evidence creating a question of fact regarding whether defendants regarded her as having a physical impairment. Consequently, a question of fact remains regarding whether Anderson was disabled.

### 2. Did Defendants Take an Adverse Employment Action Against Anderson?

{¶ 37} Next, Anderson argues that defendants took an adverse employment action against her by terminating her employment. Defendants, to the contrary, assert that no adverse employment action occurred because Anderson voluntarily resigned her employment.

**{¶ 38}** In general, an adverse employment action is a materially adverse change in the terms and conditions of the plaintiff's employment. *Paranthaman v. State Auto Property & Cas. Ins. Co.*, 10th Dist. No. 14AP-221, 2014-Ohio-4948, ¶ 34. Termination of employment qualifies as an adverse employment action. *Id.* at ¶ 43. Voluntary resignation, however, is not an adverse employment action. *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 554-55 (6th Cir.2008).

**{¶ 39}** Under Ohio common law, there are two kinds of voluntary resignation: constructive resignation and effective resignation. *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 448 (6th Cir.1999). Here, we are concerned with constructive resignation. An employee may constructively resign by failing to comply with her employer's written request requiring her to take a certain action. *State ex rel. Waldman v. Burke*, 152 Ohio St. 213, 215-16 (1949). Notably, courts only apply this doctrine where "the employer has given the employee *written notice* that his failure to act will be construed as an act of resignation, in order to ensure that each party has a clear understanding of their obligations and the repercussions of their actions." (Emphasis sic.) *Hammon* at 448.

**{¶ 40}** Here, the written notice to Anderson of action that constituted voluntary resignation appeared in the Bright Horizons employee handbook and the attendance policy. In relevant part, the handbook stated:

> Bright Horizons considers any one of the following as a voluntary resignation:
>
> - Absence from work for two consecutive scheduled days without approval or proper notice to your supervisor

(Ex. 15, Anderson Dep.) The attendance policy provided:

> **No call/No show**: If an employee fails to report to work for two (2) consecutive workdays, and fails to follow procedure for notifying his/her supervisor, Bright Horizons will consider that the employee has voluntarily resigned their position.

(Emphasis sic.) (Ex. 18, Anderson Dep.)

**{¶ 41}** Undisputedly, Anderson was absent from Bright Horizons without approval or notice on July 17 and 18, 2017. The parties, however, contest whether July 17 and 18 constituted "scheduled days" of work or "workdays." Anderson contends that neither day could be a "scheduled day" or "workday" because she did not appear on the schedule for the

week of July 17, 2017. Defendants maintain that Monday, July 17, and Tuesday, July 18, were "scheduled days" or "workdays" because, although Anderson was not on the schedule, she was normally scheduled to work on Mondays and Tuesdays.

{¶ 42} Given the circumstances of this case, reasonable minds could disagree regarding whether Anderson voluntarily resigned her employment. A factfinder could conclude that Anderson reasonably believed that July 17 and 18 were not "scheduled days" of work or "workdays," in which case, Anderson's actions could not amount to a voluntary resignation. On the other hand, a factfinder could alternatively conclude that Anderson should have reasonably understood that July 17 and 18 were "scheduled days" of work or "workdays," in which case, Anderson's failure to comply with the mandated absentee policy resulted in her voluntary resignation.

{¶ 43} If Anderson did not voluntarily resign, then Bright Horizons terminated her employment. Because reasonable minds could disagree regarding whether Anderson voluntarily resigned, a question of fact exists regarding whether Bright Horizons terminated her employment. Consequently, a trier of fact must determine if defendants took an adverse employment action against Anderson.

### 3. Did Defendants Intentionally Discriminate Against Anderson?

{¶ 44} Anderson must next prove that discriminatory intent motivated defendants to take the alleged adverse employment action against her. A plaintiff may prove discriminatory intent by either direct or indirect evidence. *Dalton*, 10th Dist. No. 13AP-827, 2014-Ohio-2658, at ¶ 26. Direct evidence is evidence that explains itself. *Gohl v. Livonia Pub. Schools School Dist.*, 836 F.3d 672, 683 (6th Cir.2016). It is evidence "that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Ray v. Ohio Dept. of Health*, 10th Dist. No. 17AP-526, 2018-Ohio-2163, ¶ 27 (internal quotations omitted). Moreover, " 'direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.' " *Id.*, quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir.2003); *accord Merrill v. E. Porter Mach. Co.*, 159 Fed.Appx. 676, 679 (6th Cir.2005), quoting *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th

Cir.2004) (" 'Direct evidence is evidence that proves the existence of a fact without requiring any inferences.' ").

{¶ 45} In the case at bar, Anderson contends she has direct evidence of discrimination: defendants terminated her employment because of her disability-related absences.[4] Anderson alleges that her pre-July 14, 2017 absences were all due to her disability because she needed to treat possible infection so it would not spread to her heart. During her deposition, Delaney testified that those absences factored into the decision to end Anderson's employment:

> Q. Did any of [Anderson's] prior absences * * *, before July 14th, 2017, have anything to do with her separation?
>
> A. Sure. It is all about consistency of care for the children and families that we serve.
>
> Q. How did those absences before July 14th, 2017, play a role in her separation?
>
> A. It falls under consistency of care for children and families.
>
> Q. So those are some of the reasons for separating her employment?
>
> A. Absenteeism is definitely considered consistency of care.
>
> * * *
>
> A. It's not about absenteeism, it's about the consistency of work and care and adhering to schedules set forth when you enter into an agreement of employment.
>
> Q. So that's a, yes, those absences before July 14th, 2017, played a role in Haley Anderson's separation?
>
> A. Inconsistency of care, yes.
>
> Q. I understand that your position is those absences affected consistency of care. But what I'm trying to get is a clear answer

---

[4] For purposes of analyzing whether Anderson presented evidence of discriminatory intent, we will presume, without deciding, that defendants took an adverse employment action against her by terminating her employment. As we stated above, whether defendants terminated Anderson's employment is a question of fact. To go any further with our analysis, however, we have to presume that Anderson satisfied the requirement of proving an adverse employment action.

on whether, yes or no, the absences before July 14th, 2017, played a role in Haley Anderson's separation?

A. Yes.

(Nov. 16, 2018 Delaney Dep. at 148-49.)

{¶ 46} According to Anderson, Delaney's testimony is direct evidence of discrimination because it establishes defendants terminated Anderson for absences that resulted from Anderson's alleged disability. But Delaney says nothing about Anderson's disability in her testimony. Consequently, Delaney's testimony does not directly correlate with an intent to discriminate on the basis of disability. A factfinder must infer that Anderson's disability, as opposed to her lack of attendance, motivated the defendants to terminate Anderson's employment. Because such an inference is necessary, Delaney's testimony is not direct evidence of discrimination. *See EEOC v. Austal USA, LLC*, 447 F.Supp.3d 1252, 1265 (S.D.Ala.2020) (holding that being fired for medical-related absences is not direct evidence of disability discrimination); *Hancock v. Greystar Mgt. Servs., L.P.*, W.D.Okla. No. CIV-15-1095-R (Oct. 18, 2016), fn. 4 (no direct evidence of discriminatory intent where the employer fired the plaintiff for job abandonment, even though the plaintiff's absences stemmed from her alleged medical condition); *Fullerton v. Pottstown Hosp. Corp.*, E.D.Pa. No. 15-5329 (July 13, 2016) ("Being fired for being absent, even if the absences are related to being sick, is not direct proof that an employee was fired for her disability.").

{¶ 47} We thus turn to whether Anderson presented any indirect evidence of discriminatory intent under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, a plaintiff must first establish a prima facie case of discrimination. *Ray*, 10th Dist. No. 17AP-526, 2018-Ohio-2163, at ¶ 24; *Dalton*, 10th Dist. No. 13AP-827, 2014-Ohio-2658, at ¶ 26. This requires the plaintiff to show: (1) he or she was disabled; (2) the employer took an adverse employment action against the plaintiff, at least in part, because the plaintiff was disabled; and (3) the plaintiff, though disabled, can safely and substantially perform the essential functions of the job in question. *Hood v. Diamond Prods., Inc.*, 74 Ohio St.3d 298, 302 (1996), citing *Hazlett*, 25 Ohio St.3d at 281. Once the plaintiff establishes a prima facie case, the burden of production shifts to the employer to offer a legitimate,

nondiscriminatory reason for the action taken. *Id.* If the employer does that, then the plaintiff must demonstrate that the employer's stated reason was a pretext for discrimination. *Id.*

{¶ 48} Confusingly, in *Hood*, the Supreme Court of Ohio adopted the elements a plaintiff must prove to recover for disability discrimination in violation of R.C. 4112.02 as the elements necessary for establishing a prima facie case for the purposes of the *McDonnell Douglas* framework. This makes little sense because it requires the plaintiff to produce proof of discriminatory intent in the second element of the prima facie stage, which conflicts with the purpose and structure of the *McDonnell Douglas* framework. *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir.2011) (a prima facie test like the one articulated in *Hood* "makes little sense, as [it includes an element requiring proof that the employee was discharged because of a disability, which] requires at the *prima facie* stage what the *McDonnell Douglas* burden-shifting framework seeks to uncover only through two additional burden shifts, thereby rendering that framework wholly unnecessary"); *accord Ferrari v. Ford Motor Co.*, 826 F.3d 885, 894 (6th Cir.2016), fn.4 (quoting and following *Whitfield*).

{¶ 49} The goal of the *McDonnell Douglas* inquiry is to progressively sharpen the inquiry until factfinder at the end reaches the ultimate question: whether the employer intentionally discriminated against the employee. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). The prima facie case is intended to "eliminate[ ] the most common nondiscriminatory reasons for the" adverse employment action, not require positive proof that the employer acted with a discriminatory motive. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). At the prima facie stage, a presumption of discrimination arises " 'only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.' " *Id.*, quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). Once establishment of the prima facie case creates the presumption of unlawful discrimination, the employer has the burden of producing an explanation to rebut the presumption. *Hicks* at 506-07. If the employer carries this burden, then the plaintiff must have the opportunity to prove that "the reason [offered] was false, *and* that discrimination was the real reason" for the employer's actions. (Emphasis sic.) *Id.* at 515. Thus, it is at this last stage of the *McDonnell Douglas* framework

that the plaintiff must produce any evidence directly bearing on whether the employer intentionally discriminated against the plaintiff.

{¶ 50} However, as an intermediate appellate court, we are bound to follow the precedent of the Supreme Court of Ohio. *State v. Tatom*, 10th Dist. No. 17AP-758, 2018-Ohio-5143, ¶ 24. Consequently, we do so in this case.

{¶ 51} With regard to the first element of the *McDonnell Douglas* prima facie case, we have found a question of fact exists regarding whether Anderson is disabled. With regard to the second element, we have found that a question of fact exists regarding whether defendants took an adverse employment action against her. Thus, we must consider if a question of fact exists regarding whether defendants terminated Anderson's employment, at least in part, because of her alleged disability.

{¶ 52} First, although Delaney's testimony is not direct evidence of discrimination, it constitutes circumstantial evidence that defendants terminated Anderson's employment because of her congenital heart defect. Both Anderson and Anderson's mother had informed Delaney that Anderson's congenital heart defect adversely affected her immune system. A reasonable factfinder could determine that Delaney deduced from this information that Anderson's congenital heart defect was the underlying cause of her numerous acute infections and concomitant absences from work. Thus, a reasonable factfinder could infer that when Delaney conceded that Anderson's absences played a role in her termination, she was really conceding that Anderson's perceived disability played a role in her termination.

{¶ 53} Second, defendants terminated Anderson's employment on July 20, 2017, only ten days after Anderson first disclosed her congenital heart defect to Delaney. The temporal proximity between the disclosure of Anderson's alleged disability and the adverse employment action is circumstantial evidence of intentional discrimination. *Jones v. Honda of Am. Mfg., Inc.*, S.D.Ohio No. 3:13-cv-167 (Mar. 9, 2015); *Eichler v. Steak N' Shake Operations, Inc.*, S.D.Ohio No. 2:12-cv-332 (Aug. 8, 2013).

{¶ 54} Finally, defendants replaced Anderson with a non-disabled person. A factfinder could infer that defendants discriminated against Anderson by terminating her employment in order to hire a non-disabled employee.

{¶ 55} Anderson also argues that the fact defendants singled her out for discipline for her cell-phone usage also demonstrates discrimination. The question here, however, is whether discrimination motivated the termination of Anderson's employment. As the phone-usage reprimand did not result in the termination of Anderson's employment, we find it irrelevant.

{¶ 56} In sum, we find that Anderson has produced evidence sufficient to create a question of fact as to whether defendants terminated her employment, at least in part, because of her perceived disability.

{¶ 57} The fourth element of the prima facie case requires consideration of whether Anderson can perform the essential functions of her job. Defendants, however, did not contest this element in moving for summary judgment, and neither party mentions it on appeal, so we do not consider it.

{¶ 58} Because defendants did not establish entitlement to summary judgment on any of the four elements of the prima facie case, we turn to whether defendants offered a legitimate, nondiscriminatory reason for terminating Anderson's employment. Defendants contend that they proffered one: Anderson's "voluntary resignation under the ["]no call/no show["] policy." (Appellees' Brief at 46.) We doubt whether this constitutes an explanation for taking an adverse employment action, as it denies taking the very adverse action it seeks to explain. Nevertheless, for purposes of this appeal, we accept it as satisfying defendants' burden of production.

{¶ 59} At this point, defendants urge us to consider whether Anderson provided evidence discrediting defendants' legitimate, nondiscriminatory reason. The trial court, however, did not address the question of pretext. Generally, appellate courts do not address issues raised in a summary judgment motion, but not decided by the trial court. *Riverside v. State*, 190 Ohio App.3d 765, 2010-Ohio-5868, ¶ 58 (10th Dist.); *Young v. Univ. of Akron*, 10th Dist. No. 06AP-1022, 2007-Ohio-4663, ¶ 22. "To consider summary judgment arguments in the first instance on appeal 'effectively depriv[es] the non-prevailing party of appellate review.' " *Lehmier v. W. Reserve Chem. Corp.*, 9th Dist. No. 28776, 2018-Ohio-3351, ¶ 49, quoting *Guappone v. Enviro-Cote, Inc.*, 9th Dist. No. 24718, 2009-Ohio-5540, ¶ 13. Consequently, we will not address whether the evidence establishes pretext.

{¶ 60} In sum, we find that Anderson failed to present any direct evidence of discrimination. Questions of fact remain, however, as to whether Anderson can establish indirect discrimination pursuant to the *McDonnell Douglas* burden-shifting framework.

{¶ 61} Finally, to recover for disability discrimination under R.C. 4112.02, a plaintiff must show that she, though disabled, can safely and substantially perform the essential functions of the job in question. As we explained above, defendants did not challenge this element on summary judgment, and neither party mentions it on appeal.

{¶ 62} Accordingly, we conclude that questions of fact preclude the grant of summary judgment in defendants' favor on Anderson's claim for "regarded as" disability discrimination in violation of R.C. 4112.02. The trial court, therefore, erred in granting defendants summary judgment on that claim, and we sustain Anderson's second assignment of error.

## B. Failure to Accommodate

{¶ 63} By her third assignment of error, Anderson argues that the trial court erred in granting defendants summary judgment on her claim for failure to accommodate her alleged disability. We disagree.

{¶ 64} "An employer must make reasonable accommodation to the disability of an employee or applicant, unless the employer can demonstrate that such an accommodation would impose an undue hardship on the conduct of the employer's business." Ohio Adm.Code 4112-5-08(E)(1). To establish a prima facie case of discrimination for failure to accommodate, a plaintiff must prove that: (1) he or she is disabled because of a physical or mental impairment that substantially limits a major life activity, a record of a physical or mental impairment, or being regarded as having a physical or mental impairment; (2) the employer is aware of the disability; (3) he or she is otherwise qualified for the position, with or without a reasonable accommodation; (4) he or she requested a reasonable accommodation; and (5) the employer failed to provide the necessary accommodation. *Coomer v. Opportunities for Ohioans with Disabilities*, 10th Dist. No. 21AP-158, 2022-Ohio-387, ¶ 17; *Shaver v. Wolske & Blue*, 138 Ohio App.3d 653, 663-64 (10th Dist.2000). The burden is on the plaintiff to propose an accommodation that is objectively reasonable. *Coomer* at ¶ 17; *DeBolt v. Eastman Kodak Co.*, 146 Ohio App.3d 474, 2001-Ohio-3996, ¶ 78 (10th Dist.). Once the plaintiff establishes the prima facie case, the burden shifts to the

employer to show that it cannot provide the accommodation because of undue hardship. *Coomer* at ¶ 17; *DeBolt* at ¶ 79.

{¶ 65} In the case at bar, Anderson argues that she first proposed a reasonable accommodation in her July 10, 2017 telephone call with Delaney. Specifically, Anderson says that she asked Delaney in that telephone call to accommodate her disability by not using her medical-related absences against her. Even construing the transcript of that call in Anderson's favor, we do not see any such request in the transcript.

{¶ 66} Next, Anderson contends that her mother proposed the same reasonable accommodation when she spoke with Delaney on July 14, 2017. In fact, in her affidavit, Melody Anderson states that she "asked Delaney not to hold [the] *heart defect* against my daughter." (Emphasis added.) (Feb. 4, 2020 Melody Anderson Aff. at ¶ 3.) Consequently, evidence establishes that Melody Anderson asked for a concession from Delaney. We thus must consider whether what Melody Anderson asked for constituted a proposal for a reasonable accommodation.[5]

{¶ 67} The notice that an employee desires an accommodation does not have to be in writing; does not have to mention the ADA, ADAAA, or R.C. 4112.02; and does not have to invoke the words "reasonable accommodation." *Shaver* at 668. However, "[a] request for accommodation must be 'sufficiently direct and specific' to give notice to the employer of the need for an accommodation and the potential reasonable accommodations that would overcome the employee's limitations." *Niles v. Natl. Vendor Servs.*, 10th Dist. No. 10AP-128, 2010-Ohio-4610, ¶ 30; *accord Miceli v. JetBlue Airways Corp.*, 914 F.3d 73, 83 (1st Cir.2019) (holding that a request for an accommodation "must comprise more than a cryptic communication to be deciphered by the recipient"). Thus, for example, a request asking an employer for "understanding" for an employee's gastrointestinal problems was too vague to invoke the statutory process required by the ADAAA to accommodate a disability. *Gagne v. SAFE Fed. Credit Union*, D.S.C. No. 3:18-208-JMC-PJG (Jan. 30, 2020), report and recommendation adopted (Mar. 27, 2020).

{¶ 68} Here, we find the request to refrain from holding Anderson's heart defect against her is not sufficiently direct and specific enough to qualify as a request for a

---

[5] "[T]hird-parties, such as family members, friends or health professionals, may request an accommodation on the employee's behalf." *Shaver* at 668. Thus, Anderson's mother may request a reasonable accommodation on Anderson's behalf.

reasonable accommodation. It is too vague for any employer to recognize it as a proposal for specific, special action needed to accommodate a disability in the workplace. Melody Anderson's request is more like general plea for "understanding" than a proposal for a concrete accommodation.

{¶ 69} When an employee does not propose a reasonable accommodation, his or her failure-to-accommodate claim must fail. *Aldini v. Kroger Co.*, 628 Fed.Appx. 347, 351 (6th Cir.2015); *Melange v. Center Line*, 482 Fed.Appx. 81, 84 (6th Cir.2012); *accord Dunn v. GOJO Industries*, 9th Dist. No. 28392, 2017-Ohio-7230, ¶ 27 ("An employer's duty to make reasonable accommodations for an employee with a disability does not arise until after the employee makes a request for an accommodation."). Here, because Anderson did not request a reasonable accommodation, she cannot establish that defendants failed to accommodate her alleged disability. Accordingly, the trial court did not err in granting defendants summary judgment on Anderson's failure-to-accommodate claim, and we overrule the third assignment of error.

## C. Failure to Participate in the Interactive Process

{¶ 70} By her fourth assignment of error, Anderson argues that the trial court erred in granting defendants summary judgment on her claim that defendants failed to participate in the interactive process to determine the appropriate accommodation for her alleged disability. We disagree.

{¶ 71} This court has never recognized a separate claim under R.C. 4112.02 or its implementing regulations for failure to engage in the interactive process. Indeed, neither R.C. 4112.02 nor the regulations mention an interactive process, much less impose a duty on employers to engage in one. Nevertheless, the duty to engage in the interactive process has crept into Ohio caselaw because federal courts have held that "the ADA mandates that an employer must engage in an 'individualized inquiry' based on an 'interactive process' to determine whether the employee's disability disqualifies her from a particular position." *O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 Fed.Appx. 605, 617 (6th Cir.2020), quoting 29 C.F.R. 1630.2(o)(3); *accord Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 421 (6th Cir.2020), quoting *Hostettler v. College of Wooster*, 895 F.3d 844, 857 (6th Cir.2018) (" 'Once an employee requests an accommodation, the employer has a duty to engage in an interactive process.' ").

**{¶ 72}** Relying on federal precedent, this court has determined that, "once an employee requests an accommodation, an employer is obligated to participate in the interactive process of seeking an accommodation." *Shaver*, 138 Ohio App.3d at 669, citing *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 314 (3d Cir.1998).  Importantly, in *Shaver*, we only addressed the failure to engage in the interactive process in the context of a claim for failure to accommodate the plaintiff's disability.  We held that when an employer eschews its duty to participate in the interactive process, a court cannot grant summary judgment on a plaintiff's failure-to-accommodate claim. *Id.* at 670-72.  Summary judgment is not appropriate because a court cannot conclude that a reasonable accommodation is not possible when an employer's bad faith precluded consideration of all possible accommodations.  *Id.* at 665, 670-72.

**{¶ 73}** Here, Anderson never requested a reasonable accommodation, so defendants' obligation to participate in the interactive process never arose.  Nevertheless, even if it had, it would only be relevant in determining whether defendants discriminated against Anderson by failing to accommodate her alleged disability as required by Ohio Adm.Code 4112-5-08(E)(1).

**{¶ 74}** In sum, the trial court did not err in granting defendants summary judgment on Anderson's claim for failure to participate in the interactive process to determine the appropriate accommodation for Anderson's alleged disability.  Accordingly, we overrule Anderson's fourth assignment of error.

### D.  Aiding and Abetting Discrimination

**{¶ 75}** By her fifth assignment of error, Anderson argues that the trial court erred in granting Delaney summary judgment on her claim that Delaney violated R.C. 4112.02(J) by aiding and abetting Bright Horizons in discriminating against her.  R.C. 4112.02(J) makes it unlawful "[f]or any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice."  Delaney argues this claim fails because it is derivative of Anderson's other claims.  Because we have concluded that Anderson's claim for "regarded as" disability discrimination should have survived summary judgment, this claim should also survive summary judgment.  Accordingly, we sustain Anderson's fifth assignment of error.

### E. Discovery Violation Sanction

{¶ 76} By her sixth assignment of error, Anderson argues that the trial court erred in sanctioning her for temporarily withholding an audio recording of the July 10, 2017 telephone conversation between her and Delaney. We disagree.

{¶ 77} On September 21, 2018, Bright Horizons served written discovery on Anderson. After receiving an extension of time to answer, Anderson filed her responses with the court on November 9, 2018. For our purposes, the relevant interrogatory and answer read:

> **INTERROGATORY NO. 15**: Please state whether Plaintiff recorded, by audiotape, video tape or any other means, any conversation she had with any current or former employee of Bright Horizons, and for each such conversation state:
>
> (a) the date of the conversation;
>
> (b) the identity of all those participating in the conversation;
>
> (c) whether Plaintiff disclosed to the other participant(s) that she was recording the conversation;
>
> (d) whether Plaintiff secured the permission of the other participant(s) to record the conversation; and
>
> (e) whether Plaintiff recorded all of the conversation, or only a portion of it.
>
> **ANSWER**:
>
> In addition to the objections to Defendant's definitions and instructions, Plaintiff objects to this interrogatory for the following reasons: (1) this interrogatory exceeds the forty interrogatories permitted under Civ.R. 33(A); (2) this interrogatory is compound under Civ.R. 33(A) and constitutes a separate interrogatory for each item of information requested, resulting in one initial interrogatory asking Plaintiff to identify any recordings and additional interrogatories per conversation identified; (3) this interrogatory seeks information protected by the attorney-client privilege and attorney work product doctrine because it seeks the contents of privileged communications between Plaintiff and Plaintiff's counsel; (4) this interrogatory violates the attorney work product doctrine because it seeks the mental impressions of Plaintiff's counsel; (5) this interrogatory seeks information

protected by the attorney work product doctrine because it seeks information concerning draft or final witness statements or affidavits secured by Plaintiff's counsel; and (6) this interrogatory seeks information protected by the attorney work product doctrine because it seeks information on the investigation of this case by Plaintiff's counsel.

(Pl.'s Resps. & Objs. To Def.'s First Set of Interrogs. at 18.)   The relevant request for production and answer read:

**REQUEST NO. 19**: All recordings identified by Plaintiff in her Answer to Interrogatory No. 15.

**ANSWER**:

In addition to the objections to Defendant's definitions and instructions, Plaintiff objects to this document request for the following reasons:  (1) this document request seeks documents protected by attorney-client privilege and the attorney work product doctrine because it seeks privileged communications between Plaintiff and Plaintiff's counsel; (2) this document request seeks documents protected by the attorney work product doctrine because it seeks documents concerning the investigation of this case by Plaintiff's counsel; and (3) this document request seeks documents protected by the attorney work product doctrine because it seeks documents concerning draft or final witness statements or affidavits secured by Plaintiff's counsel.

(Pl.'s Resps. & Objs. To Def.'s First Set of Reqs. for Produc. at 19.)  Although Anderson objected on the basis of attorney-client privilege and the attorney work product doctrine, she did not include a privilege log with her discovery responses.

{¶ 78} On Friday, November 16, 2018, Anderson's attorney deposed Delaney. During that deposition, the attorney elicited the following testimony:

Q.  [D]id Haley [Anderson] ever give you any reason to believe she had a congenital heart defect?

A.  No.

* * *

Q.  Are you sure about that?

A.  Absolutely.

(Nov. 16, 2018 Delaney Dep. at 153.)

{¶ 79} At that point, Anderson's attorney announced he was going to play the audio recording of the July 10, 2017 telephone conversation. Defendants' attorney objected to the playing of the recording because Anderson had not disclosed it in response to Bright Horizons' discovery requests. When Anderson's attorney insisted on playing the recording, defendants' attorney and Delaney left the deposition. Anderson's attorney then played the recording and had it recorded on the transcript of Delaney's deposition.

{¶ 80} Immediately after the deposition, defendants' counsel contacted the trial court's staff attorney, explained the situation, and asked for a telephone conference with the judge to discuss the matter. Anderson's counsel did not respond until the morning of Monday, November 19, 2018, when he filed a motion to compel Delaney to sit for the remainder of her deposition.

{¶ 81} In the motion to compel, Anderson argued that she had objected to the relevant interrogatory and request for production, and she was not required to produce the audio recording prior to Delaney's deposition. She pointed out that federal courts have allowed parties to delay the production of audio recordings until after a deposition of a recorded witness. These courts reason that postponing production until after depositions prevents witnesses from tailoring their testimony to their recorded statements and preserves the impeachment value of the recorded statements.

{¶ 82} After receiving Anderson's motion to compel, the staff attorney scheduled a telephone conference for the afternoon of November 19, 2018. He asked defendants' counsel to review the caselaw cited in Anderson's motion and prepare legal argument responding to Anderson's contention that she could temporarily withhold the audio recording.

{¶ 83} Although there is no transcript of the November 19, 2018 conference, both attorneys offered affidavits describing what occurred during the conference. Both attorneys agree that they argued over whether Anderson could postpone disclosure of the audio recording until after Delaney's deposition pursuant to the federal caselaw cited in Anderson's motion to compel.

{¶ 84} In a November 26, 2018 entry, the trial court ordered that: (1) Anderson must disclose to defendants any and all recordings of statements made by Delaney relevant

to the case within seven days, (2) Delaney's deposition must recommence as soon as practicable after the disclosure of the relevant recordings, and (3) the parties could not use any portion of Delaney's prior deposition related to the previously undisclosed recordings at trial. (Nov. 26, 2018 Entry.)

{¶ 85} Anderson then filed a motion to vacate a portion of the November 26, 2018 entry. Anderson argued that the trial court should vacate the part of its order striking Delaney's deposition testimony because the court lacked the authority to sanction Anderson. In support of the motion, Anderson again argued that she had a substantial legal basis to withhold the audio recording until after Delaney's deposition.

{¶ 86} In an entry dated January 8, 2019, the trial court refused to vacate its November 26, 2018 entry. In so ruling, the trial court indicated it had sanctioned Anderson under former Loc.R. 39.05(D) for failing to follow the Civil Rules of Procedure when responding to the discovery request for production of the audio recording. The trial court further found that use of the deposition testimony at trial to argue that Delaney committed perjury, as Anderson sought to do, would be unfairly prejudicial to defendants.

{¶ 87} Pursuant to former Loc.R. 39.05(D) of the Franklin County Court of Common Pleas, General Division, a trial court could sua sponte impose sanctions for failure to comply with the Civil Rules of Procedure.[6] If the trial court found that a party or attorney had failed to comply with the Civil Rules of Procedure without reasonable excuse or legal justification, the court could impose sanctions proportional to the extent or frequency of the violation. Former Loc.R. 39.05(D).

{¶ 88} A trial court has broad discretion when imposing discovery sanctions. *Nakoff v. Fairview Gen. Hosp.*, 75 Ohio St.3d 254 (1996), syllabus. An appellate court reviews rulings imposing such sanctions only for an abuse of discretion. *Id.*; *Home Sav. & Loans Co. v. Eichenberger*, 10th Dist. No. 12AP-1, 2012-Ohio-5662, ¶ 29.

{¶ 89} To determine whether the trial court erred in sanctioning Anderson, we must first address whether Anderson violated the Civil Rules of Procedure in answering Request No. 19. Interpretation of the Civil Rules of Procedure presents a question of law, which we

---

[6] Effective November 15, 2020, the trial court amended Loc.R. 39.05 and deleted the provision discussed in this decision.

consider de novo. *Gumins v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 10AP-941, 2011-Ohio-3314, ¶ 11.

{¶ 90} Generally, a party responding to an allegedly improper discovery request has two options: it "must move for a protective order under Rule 26(C) or use the objection procedure provided under the discovery method [at issue]." Civ.R. 26, Staff Notes (July 1, 1970 Amendment); *accord* Civ.R. 34, Staff Notes (1970) ("The party served with the requests has corollary burdens. Because he is subject to Rule 37 sanctions, he must object, and he must, if he desires, seek a protective order under Rule 26(C)."). Consequently, "[a]lthough a party objecting to discovery may seek a protective order or stay, it is under no obligation to do so." *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 331, 337 (N.D.Ill.2005). "The served party has the option of providing appropriate written objections and leaving it to the party seeking discovery to file a motion to compel." *Id.*; *accord* 8A Wright & Miller, *Federal Practice and Procedure*, Section 2035 (3d Ed.2021) ("In any event, a party may not remain completely silent when it regards discovery as improper. * * * [I]t must object properly or seek a protective order[.]").

{¶ 91} When presented with Request No. 19, Anderson knew she possessed an audio recording responsive to the request, but she wanted to withhold the recording until after Delaney's deposition and believed she had legal grounds to do so. Thus, Anderson had a choice. First, she could object to the production of the audio recording on the basis that she should not have to produce it until after Delaney's deposition. Second, she could file a motion pursuant to Civ.R. 26(C)(2) seeking a protective order delaying the production of the audio recording until after Delaney's deposition. Anderson choose to pursue neither of these options. Consequently, Anderson violated the Civil Rules of Procedure.

{¶ 92} We recognize that Anderson objected to Request No. 19. Anderson, however, pursued none of the asserted objections in defending her response to that request for production. Consequently, we must presume that Anderson did not pose those objections with relation to the audio recording of the July 10, 2017 telephone call.

{¶ 93} Because Anderson violated the Civil Rules of Procedure, the trial court could sanction her for this violation under former Loc.R. 39.05(D). The trial court chose to sanction her by striking the portion of Delaney's first deposition related to the audio recording. Anderson resists the extent of the trial court's sanction, protesting that it is too

harsh because it excludes deposition testimony where Delaney lied. But Anderson has failed to establish that Delaney lied in her deposition. When Delaney's deposition resumed, Delaney testified that she does not remember the July 10, 2017 telephone conversation with Anderson at all. Delaney, therefore, could not remember Anderson disclosing her congenital heart defect in the telephone call. As a consequence, when Delaney testified prior to hearing the audio recording, she testified truthfully according to her stated recollection. After hearing the audio recording, Delaney admitted that Anderson disclosed her congenital heart defect during the call, but Delaney still did not remember Anderson doing so. Given Delaney's explanation, we find no abuse of discretion in the trial court's ruling that defendants will unfairly suffer prejudice if the jury is allowed to hear Delaney's testimony denying Anderson told her about her congenital heart defect. Therefore, we conclude the trial court did not abuse its discretion in striking that evidence.

{¶ 94} In sum, the trial court did not err in sanctioning Anderson for violating the Civil Rules of Procedure by not appropriately responding to Bright Horizons' discovery requests. Accordingly, we overrule the sixth assignment of error.

### F. Compelling E-Discovery

{¶ 95} By her seventh assignment of error, Anderson argues that the trial court erred by denying her motion to compel the production of emails and text messages. We disagree.

{¶ 96} According to Anderson, she only received nine pages of emails and text messages from defendants in response to a request for production seeking documents related to her and her employment. Suspicious that more emails and text messages existed, Anderson filed a motion to compel. After the parties had engaged in court-ordered negotiations, Anderson insisted that the trial court order a search of the emails and text messages on the devices of five named individuals for the period of January 1, 2017 to June 30, 2018. Anderson demanded an extremely broad search, consisting of 14 search strings, with a total of 79 separate search terms, including such generic terms as "knew!", "sick!", "talk!", and "message!". Once the search had returned responsive emails and text messages, Anderson wanted defendants to screen the emails and text messages for privilege only. Defendants would then provide all non-privileged emails and text messages to Anderson, who would agree to return any privileged documents inadvertently produced.

{¶ 97} After the parties' negotiations, Bright Horizons searched the email of the five named individuals during the applicable time period using Anderson's and her mother's names (i.e., "Haley w/3 Anderson" and "Melody w/3 Anderson") and Anderson's and her mother's email addresses. Bright Horizons then produced 483 pages of emails to Anderson, which according to Bright Horizons, largely overlapped with Anderson's email production to Bright Horizons.

{¶ 98} In an entry dated November 15, 2019, the trial court granted Anderson's motion to compel, but ordered the search completed using the parameters proposed (and followed) by Bright Horizons.

{¶ 99} Now, on appeal, Anderson argues that the trial court erred by not ordering a search using 5 out of the 79 search terms Anderson identified. A trial court has broad discretion to regulate discovery, and an appellate court will not reverse a trial court's decision to deny or grant a motion to compel absent an abuse of discretion. *Ettayem v. Land of Ararat Invest. Group, Inc.*, 10th Dist. No. 19AP-427, 2020-Ohio-3006, ¶ 20; *Simek v. Orthopedic & Neurological Consultants, Inc.*, 10th Dist. No. 17AP-671, 2019-Ohio-3901, ¶ 117. Here, Anderson did not present the trial court with 5 search terms, but 79. Given the expansive scope of the search Anderson sought, we conclude that the trial court did not abuse its discretion in refusing to order that search. Accordingly, we overrule the seventh assignment of error.

### G. Forensic Inspection of Computers

{¶ 100} By her eighth assignment of error, Anderson argues that the trial court erred in not allowing Anderson to forensically inspect Bright Horizons' computers. We disagree.

{¶ 101} Anderson's attorney asked for the trial court to permit her to forensically inspect Bright Horizons' computers in an affidavit filed in support of a Civ.R. 56(F) motion on February 4, 2020. Under Civ.R. 56(F), a trial court "may order a continuance to permit * * * discovery to be had or may make such other order as is just." As the provisions of Civ.R. 56(F) are discretionary, an appellate court reviews the trial court's ruling on a Civ.R. 56(F) motion for an abuse of discretion. *Libertarian Party of Ohio v. Husted*, 10th Dist. No. 16AP-496, 2017-Ohio-7737, ¶ 76.

{¶ 102}         Here, Anderson claims that defendants' counsel engaged in misconduct in discovery that warrants a forensic inspection of Bright Horizons' computers. In the case Anderson relies on for the relief she seeks, the defendants repeatedly represented they had disclosed all responsive documents, when they had not. *Bennett v. Martin*, 186 Ohio App.3d 412, 2009-Ohio-6195, ¶ 42 (10th Dist.). Additionally, the defendants adopted a dilatory approach to providing discovery. *Id.* Given this evidence of noncompliance, we found the trial court did not abuse its discretion in ordering the defendants to produce to the plaintiff forensic copies of the hard drives of the defendant's corporate officers. *Id.*

{¶ 103}         Here, however, Anderson has not demonstrated defendants engaged in any misconduct, much less misconduct on the scale proven in *Bennett*. Anderson has not established that any responsive document exists that defendants have not disclosed. Accordingly, we find no abuse of discretion in the denial of Civ.R. 56(F) relief, and we overrule Anderson's eighth assignment of error.

{¶ 104}         For the foregoing reasons, we sustain Anderson's second and fifth assignments of error, and we overrule Anderson's first, third, fourth, sixth, seventh, and eighth assignments of error. We affirm the judgment of the Franklin County Court of Common Pleas in part and reverse it in part, and we remand this matter to the trial court for further proceedings consistent with law and this decision.

*Judgment affirmed in part and reversed in part;*
*cause remanded.*

LUPER SCHUSTER, P.J., and NELSON, J., concur.

NELSON, J., retired, of the Tenth Appellate District, assigned
to active duty under authority of Ohio Constitution, Article IV,
Section 6(C).

_____